**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

**UNITED STATES OF AMERICA**       :
       :
       :
    **-against-**       :
       :    **10 CR 120 (S-1) (DLI)**
       :
**HENRI  AL HALABI,**       :
       :
       :
         **Defendant.**       :
-------------------------------------------------------x


## DEFENDANT HENRI AL HALABI'S MEMORANDUM IN AID OF SENTENCING

**Benjamin Brafman, Esq.**
Brafman & Associates, P.C.
*Attorneys for Henri Al Halabi*
767 Third Avenue, 26th Floor
New York, New York 10017
Tel  (212) 750-7800
Fax (212) 750-3906
E-mail:  bbrafman@braflaw.com


**Kenneth Kaplan, Esq.**
Kaplan & Katzberg
*Attorneys for Henri Al Halabi*
767 Third Avenue, 26th floor
New York, New York 10017
Tel  (212) 750-3100
Fax (212) 750-8628
E-mail:  kkaplan@kapkatlaw.com


Benjamin Brafman
Karen A. Newirth

Kenneth Kaplan
Mayo Schreiber, Jr.
     *Of Counsel*

# TABLE OF CONTENTS

I.     INTRODUCTION……………………………………………………………………..2
       A. MR. AL HALABI SUFFERS FROM SERIOUS INTELLECTUAL AND
       COGNITIVE LIMITATIONS……………………………………………………2


II.    BACKGROUND……………………………………………………………………4
       A.     THE HISTORY AND CHARACTERISTICS OF MR. AL HALABI…………4
              1.    Mr. Al Halabi Suffers from Severe Intellectual and Cognitive
                    Limitations………………………………………………………4
              2.    Mr. Al Halabi's Life as a Young Student in Syria…………………..7
              3.    Mr. Al Halabi's Early Life in Syria……………………………………8
              4.    Immigration to, and Early Life in, the United States………………10
              5.    Mr. Al Halabi is a Devoted and Loving Husband, Father and
                    Brother……………………………………………………………11
              6.    Mr. Al Halabi is Devoted to His Elderly and Frail Parents…………14
              7.    Mr. Al Halabi Accepts Responsibility and Feels Genuine Remorse
                    for His Conduct………………………………………………………..16
       B.     THE OFFENSE CONDUCT, PLEA AGREEMENT AND GUIDELINES
              CALCULATION……………………………………………………………..17
              1.    The Offense Conduct……………………………………………17
              2.    The Plea Agreement……………………………………………18


III.   THE SECTION 3553 FACTORS AS APPLIED IN THIS CASE WARRANT A
       DOWNWARD VARIANCE……………………………………………………21
       A.     Mr. Al Halabi's Limited Intellectual and Cognitive Functioning Urges a
              Non-Guidelines Sentence……………………………………………23
              1.    Mr. Al Halabi's Limited Intellectual and Cognitive Functioning
                    Reduce His Culpability……………………………………………23
              2.    A Term of Imprisonment Will Be Significantly more Onerous Given
                    Mr. Al Halabi's Limited Intellectual and Cognitive Abilities……..25


       B.     An Incarceratory Sentence Will Harm Innocent Third Party Family
              Members, Including Mr. Al Halabi's Elderly, Infirm Parents and Young
              Children, All of Whom Depend on Mr. Al Halabi…………………………27
       C.     Mr. Al Halabi's Extensive Good Works Also Support a Non-Guideline
              Sentence………………………………………………………………30
       D.     The Court May Impose Any Sentence it Deems Sufficient but Not Greater
              Than Necessary to Achieve the Goals of Sentence; Probation is an
              Available and Appropriate Sentence………………………………..34


IV.    CONCLUSION……………………………………………………………………...40

# TABLE OF AUTHORITIES

**Cases**

Atkins v. Virginia, 536 U.S. 304 (2002)……………………………………………………6
Burgos v. U.S., No. 10-CV-403 (DAB), 2010 WL 4007289 (S.D.N.Y. Oct. 6, 2010)…..28
Gall v. United States, 128 S.Ct. 586 (2007)…………………………………………..passim
Kimbrough v. United States, 552 U.S. 85 (2007) …………………………………………passim
Nelson v. United States, 129 S.Ct. 890 (2009)…………………………………….........20
Penry v. Lynaugh, 492 U.S. 302 (1989)……………………………………………………6
Tennard v. Dretke, 124 S.Ct. 2562 (2004)………………………………………………6
United States v. Adelson, 441 F.Supp. 506 (E.D.N.Y. 2006) ……………………….passim
United States v. Allen, 250 F.Supp.2d 317, (S.D.N.Y. 2003)……………………….…...24
United States v. Avilez, No. 02-CR-999 (FB), 2005 WL 1660621
    (E.D.N.Y. Jul. 12, 2005)……………………………………………………………..24
United States v. Baker, 502 F.3d 465 (6th Cir. 2007)……………………………………28
United States v. Booker, 543 U.S. 220 (2005) …………………………………………passim
United States v. Chambers, 885 F.Supp 12 (D.C.Cir. 1995)……………………………25
United States v. Cooper, 394 F.3d 172 (3d Cir. 2005)……………………………………34
United States v. Davis, No. 07-CR-727(HB), 2008 WL 2329290
    (S.D.N.Y. June 5, 2008) ……………………………………………………………passim
United States v. Greene, 249 F.Supp.2d 262 (S.D.N.Y. 2003)……………………………28
United States v. Johnson, 964 F.2d 124 (2d Cir. 1992)………………………………..…28
United States v. Jones, 531 F.3d 163 (2d Cir. 2008)……………………………………22
United States v. Jones, 158 F.3d 492 (10th Cir. 1998)……………………………………34
United States v. Kloda, 133 F.Supp.2d 345 (S.D.N.Y. 2001) …………………………27
United States v. Kon, No. 04-CR-271-03(RWS), 2006 WL 3208555
    (S.D.N.Y. Nov. 2, 2006) …………………………………………………………………29
United States v. Mena, 968 F.Supp. 115 (E.D.N.Y. 1997)……………………………24
United States v. Milikowsky, 65 F.3d 4 (2d Cir. 1995)………………………………27
United States v. Santa, No. 05-CR-649 (JBW), 2008 WL 2065560
    (E.D.N.Y. May 14, 2008) …………………………………………………………………24
United States v. Serafini, 233 F.3d 758 (3d Cir. 2000)……………………………30
United States v. Sommerstein, 20 F.Supp.2d 454 (E.D.N.Y. 1998) ……………………27
United States v. Stewart, 590 F.3d 93 (2d Cir. 2009) …………………………………30
United States v. Tanasi, No. 02-CR-0096 (RWS), 2004 WL 406724
    (S.D.N.Y. Mar. 3, 2004) …………………………………………………………………24
United States v. Woods, 159 F.3d 1132 (8th Cir. 1998) …………………………………34


**Statutes, Legislative History, and Sentencing Guidelines**

18 U.S.C. § 1956…………………………………………………………………………17, 19
18 U.S.C. § 1957……………………………………………………………………………17
18 U.S.C. § 3553………………………………………………………………………passim
28 U.S.C. § 994………………………………………………………………………35, 36
U.S.S.G. § 2B1.1……………………………………………………………………………19
U.S.S.G. § 2B5.3……………………………………………………………………………19

U.S.S.G. § 2S1.1........................................................................................19
U.S.S.G. § 3E1.1........................................................................................19
U.S.S.G. § 5K2.0........................................................................................24

**Other Authorities**

Am. Bar Ass'n, *Standards for Criminal Justice* § 7-9.3……………………………………25

Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 247-51
    (4th ed. rev. 1994)……………………………………………………………………………..5

George S. Baroff, The Mentally Retarded Offender, in American Psychological
    Association, Manual of Diagnosis and Professional Practice in Mental Retardation,
    at 320 (John W. Jacobson & James A. Mulick eds., 1996)……………………...……26

George C. Denkowski & Kathryn M. Denkowski, The Mentally Retarded Offender in the
    State Prison System: Identification, Prevalence, Adjustment, and Rehabilitation,
    12 Crim. Just. & Behav. 55, 62 (1985)...…………………………………………………26

R. Gregg Dwyer and Richard L. Frierson, "The Presence of Low IQ and Mental
    Retardation Among Murder Defendants Referred for Pretrial Evaluation", 51 J.
    Forensic Sci. 3, 678 (May 2006)…………………………………………………………… 5

Jamie Fellner, A Corrections Quandary: Mental Illness and Prison Rules, 41 Harvard
    C.R.- C.L.L.Rev. 391, 391-403 (2006)…………………………………………………..26

Sentencing Project, *Incarceration and Crime: A Complex Relationship* 7-8 (2005)
    *available at:* http://www.sentencingproject.org/pdfs/incarceration-crime.pdf.............37

Martha E. Snell et al., "Characteristics and Needs of People With Intellectual Disability
    Who Have Higher IQs," 47 Intellectual and Developmental Disabilities 3, 221 (June
    2009)………………………………………………………………………………………..6, 23

U.S. Sentencing Commission, Staff Discussion Paper, *Sentencing Options Under the
    Guidelines* (Nov. 1996), *available at*
    http://www.rashkind.com/alternatives/dir_00/USSC_sentencingoptions.pdf.............37

United States Sentencing Commission, *Symposium on Alternatives to Incarceration*,
    "Intermediate Sanctions," July 14-15, 2008, Washington, DC………………………..38

United States Sentencing Commission, *Symposium on Alternatives to Incarceration*,
    "Welcome & Introductory Remarks," July 14-15, 2008, Washington, DC…………...38

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,       :
           :
        Plaintiff,      :
           :     **08-CR-902(S-1) (DLI)**
   -against-        :
           :
HENRI AL HALABI,        :
           :
        Defendant.    :
-------------------------------------------------------X

## I.    <u>INTRODUCTION</u>

       The defendant in this case, Henri Al Halabi, comes before the Court for sentence following his guilty plea to one count of a five count indictment.  It is not disputed that Mr. Al Halabi participated in a legitimate clothing business and also sold counterfeit clothing through the business known as Zoom Denim.  Mr. Al Halabi accepts complete responsibility for his conduct; however, it is critical for the Court to know that Mr. Al Halabi was not the mastermind behind the criminal conduct.  In fact, as is discussed in greater detail <u>infra</u>, the government concedes that there was "a major player [not being the defendant] in the counterfeit clothing business who was significantly involved in the operation of Zoom Denim and the Zoom Denim account."  (Plea Minutes at 22, l. 25 – 23, l.1; 22, ll.15-23).   For the reasons set forth below, we submit that a significantly below-guidelines sentence is the sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

### A. MR. AL HALABI SUFFERS FROM SERIOUS INTELLECTUAL AND COGNITIVE LIMITATIONS

       It is particularly important for the Court to be aware of the limited involvement of Mr. Al Halabi given his serious intellectual and cognitive limitations; a recent IQ test

showed that Mr. Al Halabi has an IQ of approximately 70.  It is well-known that persons with low IQs tend to be followers - not leaders - and subject to suggestion, which we submit occurred to Mr. Al Halabi in this case at the hands of the "major player" in Zoom Denim.  We submit that a significantly below-guidelines sentence is appropriate given this defendant's role in the offense and his seriously limited intellectual and cognitive functioning.  In addition, and as is discussed in greater detail below, a significantly below-guidelines sentence is also warranted so that Mr. Al Halabi can continue to provide much needed daily support and assistance to his frail and elderly parents, who reside with him and depend upon him for their daily needs, as well as to his wife and three young children for whom he is the sole provider.

Mr. Al Halabi has accepted full responsibility for his conduct, and nothing contained herein should be read to detract from that genuine acceptance of responsibility.  Nor are the facts presented and arguments made herein intended to condone the conduct which brings Mr. Al Halabi before the Court.  Rather, we provide this information in the belief that a full explication of the circumstances of this offense in the context of the defendant's life will demonstrate that Mr. Al Halabi merits the Court's compassion at sentence.  This memorandum sets forth Mr. Al Halabi's personal history, the details of the offense, the collateral consequences of his criminal offense for him and his family, including his elderly parents and three young children, and all other relevant factors the Court is entitled to consider in determining a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

## II.   BACKGROUND

As the Court will clearly conclude from the Pre-Sentence Investigation Report (hereinafter "PSR") and letters written on his behalf, Mr. Al Halabi's violation of the law is an anomaly for a person of otherwise exemplary character.

### A.   THE HISTORY AND CHARACTERISTICS OF MR. AL HALABI

#### 1.   Mr. Al Halabi Suffers From Severe Intellectual and Cognitive Limitations

Upon meeting Mr. Al Halabi at the very inception of the case, counsel was struck by his simple nature and lack of intellect.   It was difficult to fully communicate or "connect" with Mr. Al Halabi, and not because of any language barriers.   As a result, we sought testing with Dr. Wilfred G. van Gorp, who is a Professor of Clinical Psychology and Director of Neuropsychology at Columbia Presbyterian Medical Center, Columbia University Medical School, and the preeminent figure in his field.   See attached Curriculum Vitae of Wilfred G. van Gorp, attached hereto as Exhibit 1.    Dr. van Gorp administered numerous tests to Mr. Al Halabi and made several conclusions, including: that his IQ examination results in a score of 70, in the 2nd percentile (although his true IQ may be slightly higher due to cultural and language issues); that his perceptual reasoning is borderline, in the 8th percentile; and that **people within his group generally follow directions given by others.**  See Letter of Wilfred G. van Gorp, Ph.D. ABPP, dated December 6, 2010, attached hereto as Exhibit 2.  Mr. Al Halabi's limited intelligence was corroborated by his brother, see PSR at ¶77, and his educational record, as described below by Rabbi Abraham Hamra, who has known Mr. Al Halabi since he was a young student in Syria.

Dr. van Gorp concluded that Mr. Al Halabi functions in the "Low Average range,

meaning the majority of persons score higher than he. Persons with IQ scores in the Low Average range are generally not thought leaders but tend to follow directions set by others." (Letter of W. van Gorp at 1). Notably, Mr. Al Halabi scored in either Low Average or borderline range in each area tested by Dr. van Gorp. Id. Mr. Al Halabi's limited intellectual capacity and borderline reasoning skills provide an important explanation for how he became involved in the charged conduct while also offering a very real and compelling piece of mitigation that urges a non-guidelines and, we hope, a non-incarceratory sentence.

An individual with an IQ of 70 is defined by the DSM-IV as having "mild mental retardation." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 247-51 (4th ed. rev. 1994) (Mild mental retardation identified where IQ range is from "50-55 to approximately 70"). This diagnosis represents approximately 1-3 percent of the U.S. population. Borderline Intellectual Functioning is a DSM-IV diagnosis given for persons with an IQ in the range of 71-84. This diagnosis represents approximately 6-7 percent of the U.S. population. Id. "Given the margin of error in the measurement of IQ by standardized instruments, the distinction between MR and Borderline Intellectual Functioning is sometimes less clear and may focus on the defendant's adaptive functioning." R. Gregg Dwyer and Richard L. Frierson, "The Presence of Low IQ and Mental Retardation Among Murder Defendants Referred for Pretrial Evaluation", 51 J. Forensic Sci. 3, 678 (May 2006).

The American Association on Intellectual and Developmental Disabilities notes that "[i]ntellectual limitation exists along a continuum, revealing many similarities in human-functioning limitations between individuals on either side of the definitional

dividing line." Martha E. Snell et al., "Characteristics and Needs of People With Intellectual Disability Who Have Higher IQs," 47 Intellectual and Developmental Disabilities 3, 221 (June 2009). The article goes on to note that,

> [M]any individuals with intellectual disability with higher IQs attempt to hide their disability or attempt to pass as normal or try to appear intellectually capable and, thus, miss out on or even reject accommodations that might have been available if their disability had been declared or identified. In addition, the impact of intellectual disability may be increased by the lack of access to needed mental health care, medical care, nutrition, and relationship and parenting assistance.

Id. at 222.

As has now been confirmed by Dr. van Gorp, Henri Al Halabi has an extremely low IQ and marginal perceptual reasoning. Whether Mr. Al Halabi clinically suffers from Mild Mental Retardation or Borderline Intellectual Functioning, there can be no doubt that his intellectual and cognitive functioning is impaired. The Supreme Court has repeatedly recognized that a defendant's reduced intellectual capacity necessarily diminishes his culpability. See, e.g., Tennard v. Dretke, 124 S.Ct. 2562, 2571 (2004) ("impaired intellectual functioning is inherently mitigating"); Atkins v. Virginia, 536 U.S. 304, 318 (2002) ("Mentally retarded persons...[who] have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others... often act on impulse rather than pursuant to a premeditated plan, and... are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability."); Penry v. Lynaugh, 492 U.S. 302, 322 (1989) (mental retardation may render a defendant "less 'morally culpable than defendant who have no such excuse.'").

## 2. Mr. Al Halabi's Life as a Young Student in Syria

As is discussed in greater detail <u>infra</u>, Mr. Al Halabi was born and raised in Damascus, Syria, where he lived as part of the impoverished Jewish minority under a government that sanctioned the marginalization and oppression of Jews based on their religion. As a result, neither Mr. Halabi's parents, nor the schools he attended, had the resources to address Mr. Al Halabi's very serious mental limitations, although they were well-known to both school administrators and Mr. Al Halabi's family during those years. The Chief Rabbi of Syrian Jewry in Israel, who was formerly the President of the Talmud Torah School in Damascus while Henri was enrolled, writes of Henri's schooling:

> Henry was a student at the "Talmud Torah" school in Damascus, Syria in the early 1970's. Being Chief Rabbi of Jewish Community in Syria at that time, I had known Henry since he was two years old. During that period, I had also occupied the position of "Talmud Torah" president. Henry started attended the facility when he was three years old and left the school when he reached the ninth grade, at the age of sixteen. Throughout all those years, Henry had unceasing learning problems. He had trouble concentrating, was slow in reading and writing and suffered from low level of self-awareness. Very rarely Henry had his homework lessons prepared and required constant help in completing classroom tasks. Caring for Henry's education and future, I had regarded presenting these issues to his parents as my personal responsibility. Despite the fact that Henry's parents were well aware of his learning difficulties and probably tried to combat them, those problems never ceased. Henry had trouble adjusting to the school requirements and customs and occasionally switched classes at "Talmud Torah."
>
> In summary, I regard Henry's early education period as full of obstacles that he did not succeed to overcome due to various learning problems.

(Letter of Rabbi A. Hamra at 1).

As Rabbi Hamra notes, Henri Al Halabi did not overcome his obstacles, never

pursuing a formal education beyond the ninth grade.

Likewise, Mr. Al Halabi's older brother, Victor, writes:

> Growing up, I watched my brother quietly suffer through his learning disabilities. There was no help in Syria for children like my brother. Students were deemed either "smart" or "stupid". As a result, my brother absorbed all the negative labels and comments. Any future he or my family had hoped for with regard to his future was ended before it began. Other students would poke fun at Henri, call him names – and I, as his older brother would get into a lot of fights defending him. Your Honor, the damage was done despite all of my efforts to defend and protect him. Being tormented as a child by his teachers and peers, is not a distant memory for Henri. It has become a part of who he is. However, instead of sulking and feeling self-pity, he has turned it around by making sure that his children receive the best education.

(Letter of V. Al Halabi at 1).

We submit that Mr. Al Halabi's impaired intellectual functioning urges a significantly below-guidelines sentence for two separate but equally important reasons: first, his impairment diminishes his culpability as compared with a fully functioning defendant; and second, his impairment will make any sentence of imprisonment more onerous than the same sentence would be for a defendant of normal intelligence.

### 3.    Mr. Al Halabi's Early Life in Syria

Henri Al Halabi is a thirty-six year old father of three children. Mr. Al Halabi was born in 1974 in Damascus, Syria, where he was raised until the age of twenty, together with his two siblings and parents. The Al Halabis, like most Jewish Syrians, were forced to live in the Haret el Yahud section of Damascus, a small Jewish ghetto where they faced extensive social, political and economic persecution. Henri Al Halabi's early life in Syria, and that of his parents and his siblings, were extremely difficult in that their lives were characterized by severe poverty and discrimination as a result of being a religious

minority at a time when the Syrian government sanctioned the persecution of Jews. While the Al Halabi family was loving and supportive, their financial situation was onerous as Henri's father's job in the small garment industry in Damascus paid a miniscule salary. In addition, because the practice of Judaism was prohibited, the Al Halabis lived with the stress of maintaining their culture and religion in secret.

Life in Haret el Yahud grew worse with the influx of Palestinian refugees to Syria in 1982. The Syrian government deliberately placed many of these refugees in homes that had been abandoned by Jews who had successfully escaped Syria, knowingly creating a tinderbox of emotion and hostility by having displaced Palestinians living in close quarters with a Jewish population that was essentially being held hostage. (Syrian law prohibited Jews from leaving Syria until 1992.) The Palestinians, with widespread government support, constantly harassed the small Jewish community. As a youngster, Henri, while attending one of the two Jewish schools in Damascus, the Talmud Torah School, was frequently physically attacked and heckled by Muslim children as he walked to and from school. His brother recalled that, as a young boy in Syria, Henri was once beaten so badly in an anti-Semitic attack that he nearly died. PSR at ¶ 66.

In addition to this local friction in the ghetto, government-endorsed anti-Semitism and repression made official life particularly difficult for Syrian Jews, including the Al Halabis. They were not allowed to vote, participate in politics, or hold jobs in the government, nationally owned corporations, and banking industry. There were also legal prohibitions against bequeathing property and publically speaking Hebrew. Their activities were closely watched by "Mukhabarat," the section of the Syrian secret police

assigned to monitor the activities of Syrian Jews, political dissidents and others. Any complaints to local government officials were ignored or met with additional anti-Semitism. Emigration was forbidden and those who tried were imprisoned and sometimes murdered. This treatment engendered a deep mistrust and antipathy in the Jewish Syrian community for the Syrian government and its laws. At the same time, the community became increasingly isolated and members relied on each other for basic economic and social needs.

Henri's sister-in-law explains how these early experiences affected Henri:

> One of the most admirable qualities is how Henri has friends with all types of backgrounds and ethnicities. Experiencing discrimination first hand in his native country of Syria, Henri sees no religion, language or color – just the human being that G-D created. As a Jew, Henri was not a welcomed member of the Syrian community. Many of his peers fled with only the shirts on their backs. He experienced insults, degradation, and isolation for the mere fact that he was "different". Thus Henri truly understands the importance of accepting people of all faiths, and ethnicities and has integrated with them, and has even assisted them with finding jobs.

(Letter of N. Al Halabi at 1).

### 4. Immigration to, and Early Life in, the United States

In 1994, as a result of political pressure from the United States, the Syrian government finally changed its official policy and began to permit Syrian Jews to leave the country – although they could only take with them physical goods that they could carry with them. That same year, desiring greater opportunities and social and religious freedoms, the Al Halabi family immigrated to the United States with nothing more than their clothes and a few thousand dollars. Henri was nineteen years old at the time. The Al Halabis were subsequently granted refugee status in the United States. See Asylum

Application to the U.S. Department of Justice by Henri Al Halabi, dated June 28, 1994 and Grant of Asylum Application by the U.S. Immigration & Naturalization Service, dated September 14, 1995, attached hereto as Exhibit 3 (details severe beating of Henri, arrest of brother, and misery and government imposed difficulties of life as Jews in Syria).

Henri's older brother, Mayer, had immigrated to the United States a year earlier and was living in a basement apartment in Brooklyn. Henri, his parents, and his other brother all joined Mayer in his apartment, where they all lived for several weeks. No one spoke English. The family was assisted by the Hebrew Aid Society in New York (hereinafter "HAIS"), which loaned them money to rent a house and take English language classes. Henri immediately began studying English and found a job to help his family, continuing to live with his parents and brother until he married.

After his arrival in the United States, Mr. Al Halabi worked in the clothing manufacturing business, as he did in Syria. His jobs have included sweeping the factory floor, sewing, cutting and selling clothing. Although he strived to work continually, his work history has been interrupted by bouts of unemployment due to the decline of the clothing manufacturing business in this country. See PSR ¶¶ 78-93.

### 5. Mr. Al Halabi is a Devoted and Loving Husband, Father and Brother

Henri married Orit Fieh Al Halabi in 2001; they have a warm and loving relationship and are parents to three young children, L███, age seven years, M█████, age six years, and T██, age one year. Orit writes:

> Henri is a wonderful role model for the children; they look up to Henri as a hero. Henri loves and enjoys teaching his children how to behave properly and how to treat other

> people; with respect. Henri is a religious man; he attends
> synagogue on a daily basis, and on Saturday he brings
> M███ along so he can teach him to follow the path of our
> religion and so he can also be religious and pray daily when
> he is older.

(Letter of O. Al Halabi at 1). Friends, family and community members alike note that Mr.

Al Halabi is a loving and devoted husband and father. For example, the Rabbi who

presides over the school that L██ attends, writes:

> I became acquainted with Mr. Henri Al Halabi many years
> ago and was greatly impressed by the warm concern he and
> his wife radiated towards their family. He is a responsible
> family man and makes a concerted effort to teach his
> children by example, to be good and kind and generous to
> other people. L██ Al Halabi, the seven year old daughter of
> Mr. Henri Al Halabi, is currently enrolled in our school. Her
> manner of speech and actions, her respect and
> consideration of others, is reflective of his attempt to instill in
> his children an understanding of right from wrong, of good
> from bad.

(Letter of Rabbi J. Israel at 1). A cousin who is also a neighbor and knows the family

very well writes:

> Besides being a wonderful human being, he is an excellent
> husband and father. He truly loves his family and always
> [raves] about his kids. We can tell from the glow of his eyes
> when he talks about them that he would do anything for
> them. He always takes his son M███ to synagogue with
> him, and you can see that the kid is something special. He
> sits down next to his father respectfully, even when other
> kids are playing in the corridor. He is a true testament to his
> father's character.

(Letter of Salim and Shella Alfaks at 1-2). Many other neighbors and members of

Henri's synagogue have written letters of support describing Henri's loving guidance of

his children and other children in the community, and the special attention he gives to

his son, M███. See, e.g., Letter of Ezra Levy at 1; and Letter of Isaac and Joe Abed

at 1.

M███ Al Halabi, Henri's middle child and only son, suffers, as his father did before him, from serious learning disabilities and language disorders. M███ receives ten hours a week of special education from the New York State Special Education Itinerant Teacher ("SEIT") Services for preschool students with disabilities, along with additional speech therapy to address his language delays. See Yeled V'Yalda Special Education Student Progress Report for Annual Review, dated January 31, 2010, attached hereto as Exhibit 4. His SEIT therapist reports:

> M███ presents delays in attention/focusing, readiness, cognitive and expressive/receptive language skills . . . Although M███ has made nice progess in some areas of development, he still requires special attention and intervention. M███ has difficulty in the cognitive domain. He cannot identify most number symbols and letters of the alphabet . . . he also has difficulty identifying more than the most basic colors and shapes. These are skills that many children in his class have attained.

Id. His speech therapist reports:

> [a]lthough M███ is making progress, he continues to exhibit speech and language delays. M███ is unable to name objects within a given category, sequence picture cards . . . or answer many "wh" questions independently. M███ exhibits difficulty making inferences, responding to comprehensive questions . . . and following 23 step directives. M███ does not demonstrate comprehension or use of many basic temporal, quantitative, qualitative and spatial concepts . . . M███ Alhalabi is a 4-6 year-old boy whose speech and language delays impede his ability to learn at home and in the classroom.

Yeled V'Yalda Special Education Student Progress Report for Annual Review, dated January 14, 2010, attached hereto as Exhibit 5. M███ continues to receive this special education and yearly evaluations for same. See New York City Board of Education Individualized Education Service Plan, dated April 8, 2010 and N.Y.C.

13

Department of Education Appointment Letter, dated March 30, 2011, attached hereto as Exhibit 6.

Henri has done everything possible to ensure that his son does not face the same problems he has faced. As Henri's brother, Victor notes: "Henri's 5 year old son is currently experiencing some of Henri's learning disabilities. Immediately, Henri made sure that his son received the services he needed. My brother refuses to allow his son go down the path he had to." (Letter of V. Al Halabi at 1). In addition to making sure his son received the appropriate therapy for his learning and speech disabilities, Henri spends as much time as he possibly can with his son, especially overseeing his religious education, for the comfort and support it will offer his son as he grows. Id. See also Letter of O. Al Halabi at 1; Letter of Ezra Levy at 1.

Finally, Henri's brother, Victor, observes that "Henri is a wonderful, caring brother, as well. He has never let me down in my personal life." (Letter of V. Al Halabi at 1).

### 6. Mr. Al Halabi is Devoted to His Elderly and Frail Parents

In 2006, with financial assistance from his family, Henri bought a house. At around the same time, Henri's parents began to suffer multiple health problems. Henri and Orit decided that his parents should live with them so they could take care of them. Henri's father, Mous, has had several operations on his back and continues to suffer from a debilitating disc problem. He cannot walk without assistance, PSR at ¶59, and has trouble dressing and washing himself. Henri assists his father with his most personal and intimate needs on a daily basis, including bathing, dressing and attending to his medical needs. Henri also takes his father to synagogue, where they pray

together, and to frequent medical appointments.  <u>See</u> Letter of O. Al Halabi at 1.

Henri's mother, who was struck by a car, has permanent ankle injuries and difficulty

walking.  PSR at ¶59.  She also suffers from diabetes, depression and severe lower

back pain.  <u>See</u> Letter of V. Fariwa at 1.  Henri also assists his mother by taking her

shopping and to medical appointments. <u>See</u> Letter of University Heart Associates

M.D.'s, P.C., at 1.   Henri's parents, who have been unable to learn much English, are

also unable to write.  Orit describes their enormous dependence on Henri:

> Henri's parents rely on Henri a lot they need him for many
> things sand he is always there to help whether it is
> something like taking them to the doctor or something small
> like helping his mother shop for groceries….Henri is the sole
> provider for his family and is greatly needed by my family
> and his parents.

(Letter of O. Al Halabi at 1).

 <u>Accord</u> Letter of N. Al Halabi at 1 ("[Henri] chose to live with [his parents,] and

become their personal aid instead of hiring one. . . . He is their lifeline.  It is rare to find a

son so dedicated to the welfare of his parents.").  <u>See</u> <u>also</u> Letter of Moise Chalom at 1.

Victor Al Halabi explains Henri's importance in his parents' lives:

> In addition to being a wonderful father, Henri is a dedicated
> son.  My parents, especially my father, are both disabled.
> My father requires assistance with walking to the bathroom,
> down and up stairs and just walking in general.  He refuses
> to be in a wheelchair.  He has chronic and severe neck and
> back pain, which required 2 eight hour surgical procedures.
> Henri took it upon himself to make sure that all of my
> parent's needs were met.  Your Honor, many sons would
> help their parents.  But not many would live with them as
> Henri did.  He decided that he wanted my parents to live with
> privacy and dignity and thus moved all of them into one
> home.  You will often see Henri in the back of an ambulance
> with my mother at 2 or 3 in the morning.  Since he lives with
> them, he is the first to assist.  It's not an easy life for my
> brother, but to him, it's a rewarding one.

(Letter of V. Al Halabi at 1).

### 7. Mr. Al Halabi Accepts Responsibility and Feels Genuine Remorse for His Conduct

Henri recognizes the wrong he has done and is filled with remorse for his conduct. His friends, the Alfaks, explain: "[e]ver since he got in trouble with [the] law he has shown much remorse for what he did. He always confides with us as a couple and tells us that he truly regrets what he did. There is not a doubt in my mind that he is truly sorry for his actions." (Letter of Salim and Shella Alfaks at 1). See also, Mr. Al Halabi's statement provided to the Probation Department: "I know what I was doing was a violation of the law, and am very sorry to have gotten involved in this, and am ashamed for my actions." PSR at ¶42.

Henri's entire family is aware of his involvement in this case and his plea of guilty. As their letters make clear, Henri's family stands by him and supports him as he goes through this difficult process. See, e.g., letter of Rabbi Youssef Saadeh at 1. He has continually accepted responsibility for his conduct and expressed his remorse to his family and friends. Henri has also tried to learn from his mistake. An in-law writes:

> Since this run-in with the law, I have seen Henri lose some of that happy-go-lucky and naiveté. He has been suffering quietly over these several months. However, I was really shocked when I heard that Henri wakes up every morning, hours before most of us get up, to learn with his community rabbi, learning Jewish ethics and religion. He has truly grown in the last several months.

(Letter of J. Habert at 2).

Finally, in connection with his Plea Agreement, Mr. Al Halabi has agreed to make restitution payments totaling $75,000.00, of which he has already paid $15,000.00. The remainder will be paid at the time of sentence. Notably, Mr. Al Halabi has had to borrow

money from family members in order to meet this obligation.  We submit that Mr. Al Halabi's agreement to pay restitution and his efforts toward this end are further evidence of his genuine remorse and acceptance of responsibility.

## B. THE OFFENSE CONDUCT, PLEA AGREEMENT AND GUIDELINES CALCULATION

### 1.    The Offense Conduct

On December 2, 2010, Mr. Al Halabi pled guilty to Count One of a five count superseding indictment before Magistrate Judge Andrew L. Carter.  Count One charged conspiracy to engage in money laundering involving the proceeds from trafficking in counterfeit goods between January 2009 and January 2010 in violation of 18 U.S.C. §§ 1956(h), 1957(b), 1957(d)(1) and 351 et seq.  Mr. Al Halabi's plea was accepted by this Court on January 7, 2011.

The charges emanate from Mr. Al Halabi's involvement in Zoom Denim, a wholesale clothing retailer.  While it is uncontested that Zoom Denim engaged in the sale of counterfeit goods, the majority of Zoom Denim's sales involved legitimate apparel.

Mr. Al Halabi takes full responsibility for his actions in this case, as evidenced by his decision to plead guilty as well as his frank admissions of guilt and remorse to family and community members alike.  See, e.g., Letter of Salim and Shella Alfaks at 1; and Letter of J. Habert at 2.  An analysis of the facts and circumstances of the conduct at issue here reveals that Mr. Al Halabi was actually the pawn of a far more culpable individual who has not been prosecuted and who, unlike Mr. Al Halabi, profited significantly from the charged scheme.

As is evident from Mr. Al Halabi's plea allocution, the government concedes that

Zoom Denim, including its operations and banking, was run by a "major player in the counterfeit clothing business" whose identity is known to both the government and defense counsel. (Transcript of Plea Allocution of Defendant, December 2, 2010, at p. 22, attached hereto as Exhibit 7). Thus, for example, defense counsel has presented the government with numerous checks issued during the operative period which were issued by the "major player" who then signed Mr. Al Halabi's signature (with Mr. Al Halabi's consent). This is but one example of the way that this "major player" used Mr. Al Halabi to hide his extensive involvement with Zoom Denim while controlling both the operations and finances of the entity.

Although Probation describes Mr. Al Halabi as a "junior partner" in the business, see PSR at ¶80, we submit that he is more accurately described as a front man for this "major player." Henri did not contribute an initial investment in the company, PSR at ¶80, and did not gain most of the profits from Zoon Denim. Indeed, as the PSR shows, his income and lifestyle were and are modest, and the profits he took from his illegal activities were small. PSR at ¶¶63 and 94.[1] In the year 2009 (the period covered in Count One of the indictment), his income was $72,440. PSR at ¶93.

Further evidence of this individual's sophistication is his choice of Mr. Al Halabi for the role of "front man," given that Mr. Al Halabi's low intelligence and limited educational background together resulted in a particularly malleable and suggestive personality, as well as allocating a small share of the profits to him.

## 2. The Plea Agreement

---

[1] Henri's house, which was his one asset (currently, however, the amount of the mortgage is currently greater than the value of the house), was purchased with the help of family members. His brother is his current employer and the family is helping support him and pay his mortgage. PSR at ¶94.

Mr. Al Halabi entered into a plea agreement with the government (the "Plea Agreement") on December 2, 2010, the same day on which he pleaded guilty to Count One of the Indictment. The United States Probation Department issued its Pre-Sentence Investigation and Report on February 23, 2011.

The Plea Agreement contemplates a likely adjusted offense level under the guidelines of level 23. This adjusted offense level was reached as follows:

| Category | Points |
|---|---|
| Base Offense Level (U.S.S.G. § 2S1.1(a)(1), 2B5.3(a)) | +8 |
| Loss in Excess of $1,000,000.00 (U.S.S.G. § 2B1.1(b)(1)(I) | +16 |
| Conviction Under 18 U.S.C. § 1956 (U.S.S.G. § 2S1.1(b)(2)(B) | +2 |
| Acceptance of Responsibility Adjustment (U.S.S.G. § 3E1.1(a) and (b)) | -3 |
| Total Adjusted Offense Level | 23 |

(Plea Agreement ¶ 2). Mr. Al Halabi has no prior criminal history; therefore his criminal history level for purposes of the Sentencing Guidelines is a Category I. (PSR ¶¶ 54-55). The advisory guidelines range associated with an adjusted offense level of 23 for an individual with a criminal history Category I is 46 to 57 months imprisonment. Id.

The Probation Department's original calculation of Mr. Al Halabi's offense level included an 18 level increase under Section 2B1.1(b)(1)(I) relating to the amount of proceeds allegedly laundered by Mr. Al Halabi. Both the government and defense counsel objected (see Letter of AUSA Norkin to USPO Dorra dated March 1, 2011 and Letter of Messrs. Brafman and Kaplan to USPO Dorra dated March 7, 2011). The

Probation Department has conceded that its original calculation is not supported by the evidence, and Probation now supports the calculation set forth in the Plea Agreement and described above. (See Addendum to the PSR dated March 10, 2011).

While the defendant did stipulate to the guidelines calculation set forth in the Plea Agreement, the Plea Agreement does not, however, prevent counsel from providing the Court with all relevant information for consideration (including the categories enumerated in 18 U.S.C. § 3553(a)), or from arguing that a sentence below this range would be "reasonable" under the law, and also not greater than necessary to achieve the purposes of sentencing.

The Supreme Court has clarified that, in addition to being advisory, the guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence." Kimbrough v. United States, 552 U.S. 85, 90 (2007). In Nelson v. United States, 129 S.Ct. 890 (2009), the Supreme Court re-emphasized that the guidelines are both advisory and not to be presumed reasonable. The Court explained:

> Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. In *Rita* we said as much, in fairly explicit terms: "We repeat that the presumption before us is an *appellate* court presumption. . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." And in [*Gall*] we reiterated that district judges, in considering how the various statutory sentencing factors apply to an individual defendant, "may not presume that the Guidelines range is reasonable" . . .
>
> The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.

Id. at 892. (internal citations omitted).

## III. THE SECTION 3553 FACTORS AS APPLIED IN THIS CASE WARRANT A DOWNWARD VARIANCE

As this Court is well aware, in United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the then-mandatory Sentencing Guidelines system violated the Sixth Amendment. As a result, the Supreme Court in Booker rendered the Sentencing Guidelines "advisory." In addition to being advisory, the Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence." Kimbrough, 552 U.S. at 90. Thus, while a sentencing court must begin the process of determining an appropriate sentence for a criminal defendant by calculating the applicable Guidelines range, it "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." Gall, 128 S.Ct. at 596. Section 3553(a), "as modified by Booker, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Kimbrough, 552 U.S. at 100 (citing sentencing goals set forth in18 U.S.C. § 3553(a)(2)(A)-(D)).

The § 3553(a) factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant, and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the advisory guideline range; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities;

and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). See <u>Booker</u>, 543 U.S. at 224. Section 3553(a) specifically directs that courts "shall impose a sentence sufficient, <u>but not greater than necessary</u>, to comply with the purposes set forth in paragraph (2) of [§3553(a)]." 18 U.S.C. § 3553(a) (emphasis added).

Furthermore, after <u>Booker</u>, a sentencing court need not find that a particular 3553(a) factor is "extraordinary" or sufficient to take a case out of the "heartland" in order to justify a below-guidelines sentence. Even those factors that would not necessarily result in the granting of a downward departure – or even those factors that were expressly prohibited or deemed irrelevant by the Sentencing Guidelines – must now be considered under the mandate of § 3553(a). See <u>United States v. Jones</u>, 531 F.3d 163 (2d Cir. 2008). As this Court well knows, Section 3553(a) provides that, in determining the appropriate sentence, the district court must "make an individualized assessment based on the facts presented," which is "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" <u>Gall</u>, 128 S.Ct. at 597.

Section 3553(a) allows a sentencing court to consider a defendant in all of his or her unique humanity. As Judge Rakoff so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

<u>Adelson</u>, 441 F.Supp.2d at 513-514.

**A.    Mr. Al Halabi's Limited Intellectual and Cognitive Functioning Urges a Non-Guidelines Sentence**

Mr. Al Halabi's limited intellectual functioning urges a non-guidelines sentence for two separate, but equally important, reasons.   First, Mr. Al Halabi's limited intellectual functioning and attendant susceptibility to manipulation goes directly to his culpability, which is the central factor in determining an appropriate sentence.   Second, Mr. Al Halabi's reduced intellectual functioning and borderline perceptual reasoning will make prison a more onerous and, potentially, dangerous environment as compared with inmates of average and above-average intellectual functioning.   This fact also suggests that a sentence lower than that appropriate for an "average" defendant – as represented by the applicable guidelines range – is warranted in order to make the punishment fit the defendant in this unique case.

**1.    Mr. Al Halabi's Limited Intellectual and Cognitive Functioning Reduce His Culpability**

While Mr. Al Halabi is obviously a fully functioning member of society, he does have a documented history of limited intellectual and cognitive functioning that has impaired his ability to succeed in certain material respects.   Regardless of how he may appear to a layperson, there is simply no denying the fact that his IQ tests at a rate that is borderline at best.   As discussed *supra*, it is not uncommon for individuals of compromised intellectual functioning to compensate for their limitations, thereby appearing more competent than they actually are.   Martha E. Snell et al., "Characteristics and Needs of People With Intellectual Disability Who Have Higher IQs," 47 Intellectual and Developmental Disabilities 3, 221 (June 2009).   In this case, it is

clear from Dr. van Gorp's examination that Mr. Al Halabi is, at best, borderline or low-functioning. We submit that it is appropriate for this Court to conclude that Mr. Al Halabi's intellectual and cognitive limitations reduce his culpability below that of the "average" defendant whose culpability is reflected by the advisory guidelines range. As a result, a below-guidelines sentence is warranted. Such a conclusion has been endorsed by courts within this circuit and throughout the country.

Courts considering a reduction in sentence based on a defendant's intellectual or cognitive limitations or diminished capacity (*see* U.S.S.G. § 5K2.0) have focused on various factors in granting downward variances, including reduced mental capacity and functioning, low IQ, and dominance, suggestibility and manipulation by others. See, e.g., United States v. Santa, No. 05-CR-649 (JBW), 2008 WL 2065560 (E.D.N.Y. May 14, 2008) (defendant's low IQ and manipulation by others mandates downward departure); United States v. Avilez, No. 02-CR-999 (FB), 2005 WL 1660621 (E.D.N.Y. Jul. 12, 2005) (defendant's IQ of 70, failure to complete the 9th grade, poor academic standing, attendance and behavior, and tendency "to defer to others with little analysis of their intentions" merited a downward variance); United States v. Allen, 250 F.Supp.2d 317 (S.D.N.Y. 2003) (defendant's limited mental capacity which allowed him to be manipulated by others to participating in instant criminal activity justified departure); United States v. Tanasi, No. 02-CR-0096 (RWS), 2004 WL 406724 (S.D.N.Y. Mar. 3, 2004) (defendant's diminished capacity related to commission of offense allowing for departure); United States v. Mena, 968 F.Supp. 115 (E.D.N.Y. 1997) (defendant's low IQ, psychological capacity to manipulation, and domination and manipulation by co-defendant, entitled defendant to departure); United States v.

<u>Chambers</u>, 885 F.Supp 12, 13 (D.C.Cir. 1995) (defendant's diminished capacity and extraordinary family circumstances merited a downward departure).

In this case, the Court should likewise grant a non-guideline sentence based on Mr. Al Halabi's limited capacity. As Dr. van Gorp reported in his comprehensive analysis of Henri, his perceptual reasoning is in the 8th percentile, <u>i.e.</u>, "borderline," and his IQ is 70 or close to 70. PSR at ¶76. Dr. van Gorp concluded that "based on the majority of indices, the defendant is functioning in the low-average range." <u>Id</u>. Finally, Dr. van Gorp noted that "people within this group generally tend to follow directions given by others." <u>Id</u>. Throughout his life, Henri has had "unceasing learning problems" in school, had trouble concentrating, rarely had his homework prepared, and required constant help in completing classroom tasks. PSR at ¶74. In summarizing Henri's early education, Rabbi Hamra notes that it was "full of obstacles that he did not succeed to overcome due to various learning problems." <u>Id</u>.

Mr. Al Halabi functions at a very low, and possibly borderline, level. Because his impaired intellect and subservient nature caused him to be amendable to be a front man for the "major player" in the counterfeit clothing business, we submit that a downward departure in light of these factors is appropriate. <u>Accord</u> Am. Bar Ass'n, *Standards for Criminal Justice* § 7-9.3 ("Evidence of mental illness or mental retardation should be considered as a possible mitigating factor in sentencing a convicted offender.").

        **2.**      **A Term of Imprisonment Will Be Significantly More Onerous Given Mr. Al Halabi's Limited Intellectual and Cognitive Abilities**

It is likewise well-recognized that prison can be a much harsher environment for individuals with significant intellectual and cognitive limitations, such as Mr. Al Halabi.

As one treatise observes:

> [i]f prison is viewed as a dangerous place for the
> nonretarded inmate, imagine the threat posed to the
> individual whose cognitive limitations render him or her
> vulnerable to the wishes of brighter and more exploitative
> inmates.

George S. Baroff, The Mentally Retarded Offender, in American Psychological Association, Manual of Diagnosis and Professional Practice in Mental Retardation, at 320 (John W. Jacobson & James A. Mulick eds., 1996). See also George C. Denkowski & Kathryn M. Denkowski, The Mentally Retarded Offender in the State Prison System: Identification, Prevalence, Adjustment, and Rehabilitation, 12 Crim. Just. & Behav. 55, 62 (1985) (majority of surveyed state correctional officials acknowledged that inmates with mental retardation were "manipulated and victimized by the general prison population," including sexual exploitation).

In addition to being at risk for abuse or exploitation by other inmates, inmates with limited functioning, such as Mr. Al Halabi, may also find themselves at greater risk of inadvertently violating prison procedure, resulting in more frequent discipline, perhaps by corrections staff who are unaware of an inmate's status or untrained in how to properly handle an inmate with limited intellectual and cognitive function. See, e.g., Jamie Fellner, A Corrections Quandary: Mental Illness and Prison Rules, 41 Harvard C.R.- C.L.L.Rev. 391, 391-403 (2006) (finding, inter alia, "[m]ost prison systems do not provide correctional officers with more than minimal mental health training" and "[f]ew prison systems have begun to wrestle seriously with how to incorporate mental health considerations into their disciplinary procedure"). Finally, it has been observed that prison conditions may cause the deterioration of existing skills. This may be due to a

lack of habilitation programming or simply the loss of support structures relied upon by an individual throughout his life.

Henri Al Halabi has gotten as far as he has in life, despite his significant limitations, largely because of the support of his large and loving family. Each member of Henri's family – from his brother, who employs him, to his wife, who ensures that his day-to-day needs are met, enabling him to support his parents in turn – is part of an important support system that will be seriously disrupted by any period of incarceration. The fact that prison will be a more difficult – and potentially more dangerous and destructive – environment for Mr. Al Halabi is a legitimate basis for a downward variance from the advisory guideline range, which is clearly not calculated with a defendant like Mr. Al Halabi in mind.

**B.** **An Incarceratory Sentence Will Harm Innocent Third Party Family Members, Including Mr. Al Halabi's Elderly, Infirm Parents and Young Children, All of Whom Depend on Mr. Al Halabi**

Courts in the Second Circuit and elsewhere have taken into consideration the effects of a defendant's incarceration on innocent third parties in granting below-guidelines sentences and downward departures. United States v. Milikowsky, 65 F.3d 4, 7 (2d Cir. 1995); United States v. Sommerstein, 20 F.Supp.2d 454, 462 (E.D.N.Y. 1998). Likewise, courts in this Circuit and elsewhere have looked to a defendant's familial relationships and responsibilities in imposing below-guidelines sentences and downward departures. United States v. Kloda, 133 F.Supp.2d 345, 348 (S.D.N.Y. 2001) (A judge must sentence "without ever being indifferent to a defendant's plea for compassion, for compassion also is a component of justice.").

The Second Circuit has explained the rationale for considering family

circumstances and the effect on a defendant's family when determining his or her ultimate sentence: "the rationale . . . is not that [defendant's] family circumstances decrease [his] culpability, but that we are reluctant to wreak extraordinary destruction on dependents . . . " United States v. Johnson, 964 F.2d 124, 129 (2d Cir. 1992). See also United States v. Greene, 249 F.Supp.2d 262, 266 (S.D.N.Y. 2003) (seven level downward departure from a Guidelines level of 15 to probation due to, inter alia, family circumstances: "sentencing courts must therefore focus on the vulnerability of [a defendant's] dependents, assessing the hardships that a sentence of incarceration would impose on them."). Courts grant variances when they find that family circumstances are unique, as they are herein. See, e.g., United States v. Baker, 502 F.3d 465, 469-70 (6th Cir. 2007); Burgos v. U.S., No. 10-CV-403 (DAB), 2010 WL 4007289 (S.D.N.Y. Oct. 6, 2010).

Further, courts recognize that, where incarceration will have destructive effects on a defendant's family, such a sentence may in fact undermine important goals of punishment, including providing correctional treatment in the most effective manner. See, e.g., United States v. Davis, No. 07-CR-727(HB), 2008 WL 2329290 at *5 (S.D.N.Y. June 5, 2008) citing 18 U.S.C. § 3553(a)(2)(D). The Davis case is instructive, as it also involved a defendant with a large family (six children ranging in age from three to twelve years old) that depended upon him for financial and emotional support and guidance. To be sure, there are differences between this case and Davis – in Davis, the defendant pled guilty to possession of a sawed off shotgun, had a prior arrest record and was poor, having previously been homeless. These seemingly different defendants share one critical commonality: the potentially devastating effect a period of

incarceration would have on a large, close-knit family with young and vulnerable children.

While it is clear Henri's young children are at risk if he is incarcerated, there is particular concern that Henri's son, M███ will be especially impacted. Henri, having suffered and still suffering from his disabilities, has done everything possible to help ameliorate M███'s learning and speech disabilities, including making sure that his son receives special education and spending as much time with him as he possibly can. Henri's absence will undoubtedly have a much more severe effect on M███ than the average child of a defendant facing extended incarceration.

In departing downward to a term of time served with three years' supervised release from a recommended guidelines range of 18 to 24 months' imprisonment, Judge Baer concluded that "any term of imprisonment not only would be 'greater than necessary' to accomplish the goals of sentencing, but also would undermine those goals by halting Mr. Davis's significant positive impact on his children's life. . . . Any term of imprisonment would be disastrous to Mr. Davis's family." Davis, 2008 WL 2329290 at *5.

As the letters submitted in support of Mr. Al Halabi make clear, any absence from his home and from the daily lives of his family would have devastating consequences for his three young children, his wife and his parents. See, e.g. Letter of O. Al Halabi at 1; Letter of V. Al Halabi at 1; and Letter of V. Fariwa at 1. Accord, United States v. Kon, No. 04-CR-271-03(RWS), 2006 WL 3208555, *5-6 (S.D.N.Y. Nov. 2, 2006) (non-incarceratory sentence where incarceration would damage the defendant's children).

We submit that any separation resulting from a period of incarceration will damage the well-being of Mr. Al Halabi's children and parents.

### C.    Mr. Al Halabi's Extensive Good Works Also Support a Non-Guideline Sentence

Courts recognize that a defendant's good works, in particular those for which a defendant has given his time rather than simply his money, provide a basis for a downward variance from an advisory guidelines sentence.  <u>See</u> <u>United States v. Stewart</u>, 590 F.3d 93, 170 (2d Cir. 2009); <u>United States v. Serafini</u>, 233 F.3d 758, 774-75 (3d Cir. 2000).  <u>Accord,</u> <u>United States v. Adelson</u>, 441 F.Supp. 506, 513 (E.D.N.Y. 2006).  As the many letters in support of Mr. Al Halabi demonstrate, Henri has engaged in continual and extraordinary "good works" for a man of his limited disposition.

Henri is truly a gentle and humble man and has helped many neighbors and friends.  One of Henri's close neighbors, an elderly woman who lives alone, writes:

> I am a ninety year old woman who lives near Henry.  Being the age that I am, doing everyday things is not so easy. From going to the supermarket, the Dr's, and day to day errands, it's a struggle.  Luckily, Henry makes my day to day living much easier.  Henry is always there with a helping hand.  I can't even count how many times he has gone to the supermarket on my behalf. All I have to do is give him the shopping list and within hours the task is done.
>
> At my age, going to doctors is crucial for everyday living. Henry is a constant figure that I can count on to arrange a way for me to get to the doctor and get home.  It's a lot of relief knowing that there is a person who cares enough to make sure I have the ability to do what needs to be done.
>
> Also, this being a horribly cold and snowy winter, I know Henry is always near to shovel me out.  As soon as the snow stops, Henry is out shoveling my pathway and steps, making sure it's safe enough for me to get out.  If it wasn't for him, I would have been stuck many days in the house.

(Letter of L. Salamah at 1). A cousin and neighbor states:

> I am aware of Henri's legal situation and I am writing to you
> to tell you that our community is a better place with Henri
> around. His endless hours of contribution to people in need
> have made lasting impressions on many of us.
>
> I want to share with you a recent encounter I had with Henri.
> About 4 months ago, my wife and I were moving houses. It
> wasn't easy moving with a 1 year old son, especially with my
> wife being 7 months pregnant. During the move, the U-Haul
> truck we rented broke down after we had already loaded all
> our furniture onto the truck. We were still a few blocks away
> from our new house, and the time was getting late. You can
> imagine the frustration we felt after all the hard work we put
> in . . . It was then we saw Henri driving by. He immediately
> pulled over and asked how he can be of any help. After I
> explained the situation to Henri, he immediately drove to the
> U-Haul location, rented a new truck and helped us unload,
> and the reload all our furniture. He stayed with us for nearly
> 4 hours until he made sure that our move was completed.
> My wife and I are very grateful for Henri's help that day, and
> we know first hand of how he is a productive member of
> society. His positive attitude has always lifted our spirits,
> and I am sure that he will help us in time of need.

(Letter of M. Allaham at 1). Many other people have written of Henri's acts of kindness

and help. See, e.g., Letter of J. Habert at 2; Letter of F. Hamra at 1; Letter of Z. Lati at

1; Letter of E. Levy at 1; and Letter of T. Niauh at 1.

Even complete strangers have been the recipient of Henri's acts of kindness:

> [d]uring the post-Christmas snow storm in New York, I was
> at my friend's house celebrating his 22nd birthday. We got
> caught up in the celebrations and didn't pay attention to the
> fast falling snow. By the time it was midnight, 12 inches of
> snow had covered the streets. After 20 minutes of shoveling
> with friends, I managed to get my car out. I only drove about
> 50 feet before my car go stuck again in the middle of the
> snow. I got out and tried to shovel it out, but I realized I was
> freezing and completely exhausted. I called for help and
> waited in the car. It was then that Henri, a total stranger at
> the time, came and offered me to wait inside his house. I

went in, and he was a very hospitable host – he made me a cup of hot tea and a small snack . . . We talked for a half hour until my help arrived and I was able to leave warm.

Ever since that night, I appreciate how far a little kindness can go. I try to emulate Henri's character everyday by doing small acts of kindness to random people. I have been touch[ed] by Henri, and I am sure that many others have been also.

(Letter of G. Metta at 1). <u>See</u> <u>also</u> Letter of M. Levy at 1(Henri insisted that he and a friend who were driving help someone on the parkway one stormy night).

More importantly, perhaps, is Henri's support of friends who have lost jobs, or his giving of small amounts of financial assistance to those in need:

About a year ago, I was laid off my job. Having a wife, four kids, and a mortgage, I was very stressed out. I started to smoke and rarely left the house. It was not easy to be around me. I was not paying attention to my wife and kids. Things became very tense and stressful. Everything was spiraling out of control until a great friend came to "the rescue." That great friend is Henry Al Halabi . . . .

He encouraged me to realize all the other good things in my life . . . Everyday I would get a phone call from Henry with an uplifting speech to get me through the day. He even went to the extent of finding me a job . . . which was exactly what I needed to get out of the depression I was in . . . My family and I owe him everything.

(Letter of N. Hasbani at 1). Henri helps friends and community members with modest financial donations to help with food or tuition payments. <u>See</u>, <u>e.g.</u>, Letter of M. Louz at 1 ("My family [and] I have 5 kids on every holiday he came to me help me with food for my kids and clothing[.]"); and Letter of S. Ambud at 1 ("[H]e helped me paying a portion of the tuition in order for my kids go to the same school they use to"). Toune Niauh, who has received help from Henri, summarizes his help to many members of the community:

> [w]hat is unique about Henri is that he doesn't help you once and then he forgets about you, he goes around daily to help people . . . If I were to describe Henri in a couple of words I would say he is unselfish, caring and a wonderful friend and father.

(Letter of T. Niauh at 1).

Finally, Henri is devout man who is important to other members of his synagogue. <u>See</u> Letter of Y. Saadeh at 1. Henri prays three times daily, and helps make sure his synagogue always has a *minyan* (the quorum required by Jewish law for public prayer). The Rabbi and President of his synagogue, along with members of the congregation, attest to his religious devotion and the support he has engendered:

> [w]e are writing to Your Honor in support of a valued member of our congregation, Mr. Henri Al Halabi. Mr. Al Halabi is an active member of our congregation who attends weekly Sabbath and holiday prayer services. Mr. Al Halabi has demonstrated that he is a man who is deeply devoted to his religion, his family and his friends. Indeed, Mr. Al Halabi frequently brings his son to our shul so as [to] implant in his son a sense of attachment to Judaism and to impart to [his] son the beauty of the many customs that are practiced by Sephardic Jews in general, and those of Syrian descent specifically.

Letter of Mishkan Yerushalayim at 1. <u>See also</u> Letter of Eli Zlita at 1.

A family friend writes of the very meaningful assistance Henri gave his family during a time of grief:

> I want to express my gratitude for a humble individual . . . In the Jewish religion, when a person passes away, there are a lot of laws and customs we follow. My father passed away the day before the terrible snowstorm at the end of December 2010. Once a Jewish person passes away, they must be buried right away. Once they are buried there is a law requiring the immediate family "sit" for 7 days straight. During the "sitting," the men of the family are required to pray 3 times a day with a minimum of 10 men.

As most know, it was almost impossible to leave our houses that horrific week. But with the help of Henry we were able to keep the laws of the "sitting." They say by keeping these laws, we are elevating the soul of the deceased. Which in turn puts my father, may he rest in peace, on an easy track to heaven. Henry made phone calls and physically went and picked up numerous people to make sure we fulfilled these laws . . . . Henry continued to amaze us. On the 7th day, Henry gathered enough people to take us all to the cemetery. Once we were there, he assisted in shoveling the mounds of snow, then he shoveled to bury the body. Words cannot express our gratitude to him.

(Letter of F. Hamra at 1).

Where such good works such as these are as extensive in scope, courts recognize that a downward variance is appropriate. See, e.g., United States v. Cooper, 394 F.3d 172, 178 (3d Cir. 2005) (affirming the District Court's order granting Cooper a four level downward departure given the defendant's exceptional service); United States v. Woods, 159 F.3d 1132, 1136 (8th Cir. 1998) (upholding defendant's downward departure for charitable activities); and United States v. Jones, 158 F.3d 492 (10th Cir. 1998)(affirming departure based in part on defendant's long history of community service and his strong support in the community).

**D.    The Court May Impose Any Sentence it Deems Sufficient but Not Greater Than Necessary to Achieve the Goals of Sentence; Probation is an Available and Appropriate Sentence**

Section 3553(a)(3) directs a sentencing court to consider all of the sentences available in fashioning an individualized sentence in any given case. In this case, a full range of sentences are available for imposition on Henri Al Halabi, ranging from probation to imprisonment. We respectfully submit that, while probation is not statutorily mandated, it is nevertheless the single most appropriate sentence given the Supreme Court's recent pronouncements, the mandate of the Sentencing Reform Act ("SRA"),

and social and public policy research that recognizes the benefits of punishing individuals through alternatives to incarceration.

In Gall, the Supreme Court upheld a sentence of 36 months' probation imposed on a defendant facing an advisory guidelines range of 30 to 37 months imprisonment. In so finding, the Supreme Court explained that "probation is not granted out of a spirit of leniency . . . [and] is not merely letting an offender off easily. . . . [P]robation . . . conditions imposed on an individual can have a significant impact on both that person and society . . ." Gall, 128 S.Ct. at 596, n.4 (internal citations and quotation marks omitted). Indeed, the Supreme Court noted that probation – even when imposed without any additional restrictive conditions – is a substantial punishment: "Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty," and that "[m]ost probationers are also subject to individual 'special conditions' imposed by the court," which make the sentence of probation even more severe. *Id.* at 595-96.

In so finding, the Supreme Court echoed Congress' intention – and direction to the Sentencing Commission – that probation be available to sentencing courts in many cases as, in many cases, probation is the appropriate sentence. In the SRA, Congress explicitly presented probation as a distinct type of sentence with independent value, not simply a lenient option to be used only in extraordinary cases. Congress directed the Commission to "promulgate . . . guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case, including . . . a determination *whether* to impose a sentence to probation, a fine, *or* a term of imprisonment." 28 U.S.C. § 994(a)(1)(A) (emphasis added). Furthermore, in the SRA,

Congress expressed the expectation that imprisonment would be inappropriate and that probation would meet the requirements of 18 U.S.C. § 3553(a)(2) for certain offenders. Specifically, 28 U.S.C. § 994(j) charges the Commission with "insur[ing] that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense[2][.]" The term "serious offense" was left undefined by Congress.

The legislative history of the SRA also emphasized that probation may be an appropriate sentence in many circumstances:

> It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose. This is particularly true in light of the . . . requirement in section 3563(a) that a convicted felon who is placed on probation must be ordered to pay a fine or restitution or to engage in community service; he cannot simply be released on probation with no meaningful sanction.

S. Rep. 98-225, 92, 1984 U.S.C.C.A.N. 3182, 3274-5 (Aug. 4, 1983).

While the Sentencing Commission has not implemented Congress' directive by fashioning guidelines that incorporate probation as a sentencing option in the designated category of cases, see Kimbrough, 552 U.S. at 109 (the Commission did not "exercise . . . its characteristic institutional role" as envisioned by the SRA), the Commission has nevertheless recognized repeatedly that sentences of probation are often preferable to sentences of imprisonment for non-violent, first time offenders like

---

[2] We do not seek to minimize the seriousness of Mr. Al Halabi's conduct, though we believe that, in establishing these categories of crimes for which probation would be an appropriate sentence, Congress would *not* have viewed a nonviolent first offense like this one as a "serious offense."

Mr. Al Halabi.  For example, in 1996, the Commission recognized that sentencing "alternatives divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties."  U.S. Sentencing Commission, Staff Discussion Paper, *Sentencing Options Under the Guidelines* (Nov. 1996), *available at* http://www.rashkind.com/alternatives/dir_00/USSC_sentencingoptions.pdf.  This conclusion is amply supported by the available social and public policy research.  <u>See, e.g.</u>, Sentencing Project, *Incarceration and Crime: A Complex Relationship* 7-8 (2005) *available at* http://www.sentencingproject.org/pdfs/incarceration-crime.pdf ("The rapid growth of incarceration has had profoundly disruptive effects that radiate into other spheres of society.  The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to fray family and community bonds, and contribute to an increase in recidivism and future criminality.").

These concerns are particularly resonant in the case of Henri Al Halabi, where a sentence of prison will destabilize his family unit; will have serious negative consequences for Mr. Al Halabi's elderly and frail parents; and will subject an individual of seriously compromised intellectual functioning to much more serious criminals who could easily take advantage of or harm him.  These negative effects are easily avoidable, without giving up the principal goals of punishment set forth in § 3553(a), simply by imposing a sentence of probation together with a fine and whatever additional conditions the Court deems proper.

As the Court is aware, the USSC held a national Symposium on Alternatives to

Incarceration in Washington, D.C., on July 14-15, 2008. The symposium "brought together leaders from the federal judiciary, law enforcement, the legal community and academia to discuss cutting edge legal issues and to exchange innovative ideas regarding current federal sentencing policy. The purposes of this symposium were to gather information regarding the use of alternatives to incarceration and to provide a forum for idea-sharing concerning possible implementation of non-incarceration sanctions in the federal system." United States Sentencing Commission, *Symposium on Alternatives to Incarceration*, "Welcome & Introductory Remarks," July 14-15, 2008, Washington, DC, at 2.

Among the Commission's findings were "intermediate sanctions . . . restrict personal liberty and afford rehabilitati[on]" and "community service [in particular] lower[s] recidivism rates." United States Sentencing Commission, *Symposium on Alternatives to Incarceration*, "Intermediate Sanctions," July 14-15, 2008, Washington, DC, at 332. More specifically, community service programs

> can be effective when the community service is related to the offense committed and the individual's skills. One successful example was a builder, convicted of an antitrust offense, who constructed a camp for youth with spina bifida as part of his community service. Community service costs less than incarceration, is generally supported in the federal system (by a 2005 monogram issued by the Administrative Office of the United States Courts) and can be a very effective means of restitution and reparation to society and to individual victims.

Id. (emphasis added).

This recent trend in sentencing represents a viable, cost-effective and appropriate alternative to incarceration. It allows an individual the opportunity to make a positive contribution to the community while also satisfying the objectives of sentencing.

It is an option that has been encouraged by the United States Sentencing Commission and we hope it will be seriously considered when the Court is determining its sentence for Mr. Al Halabi. We respectfully request that community service, supervised release and an appropriate fine in lieu of imprisonment is the kind of sentence available that will allow Mr. Al Halabi to give back to the community and at the same time serve as a constant reminder of his regrettable crime.

Taking into consideration the § 3553(a) factors addressed herein and taking into account Mr. Al Halabi's personal characteristics and circumstances involving the offense, this sentencing option would balance retribution with rehabilitation by complying with the purposes set forth herein pursuant to 18 U.S.C. §3553(a)(2). It would reflect the seriousness of the instant offense and just as importantly would take into account the mitigating factors presented herein. It is our hope that a community service alternative to any period of incarceration will be considered and subsequently imposed by the Court for this defendant.

## VI.  CONCLUSION

For all the reasons stated above, it is respectfully requested that the Court sentence Mr. Al Halabi to non guideline sentence substantially lower than 46 to 57 months.

Respectfully submitted,

Kenneth J. Kaplan
Mayo Schreiber, Jr.
KAPLAN & KATZBERG
767 Third Avenue, 26th Fl.
New York, New York 10017
(212) 750-3100
Counsel for Henri Al Halabi

Benjamin Brafman
Karen A. Newirth
BRAFMAN & ASSOCIATES, P.C.
767 Third Avenue, 26th Fl.
New York, New York 10017
(212) 750-7800
Counsel for Henri Al Halabi


Dated:  New York, New York
           March 25, 2011


To:    Walter Norkin, Esq.
        Assistant U.S. Attorney

        Michael Dorra
        U.S. Probation Officer